UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TENTANDTABLE.COM, LLC, and ZOOM
BLOWERS, LLC,

               Plaintiffs,

    v.

MOHAMMED ALJIBOURI et al.,

               Defendants.

_____

        22-CV-78-LJV
        DECISION & ORDER

On January 26, 2022, the plaintiffs, Tentandtable.com, LLC ("Tentandtable"), and

Zoom Blowers, LLC ("Zoom Blowers"), commenced this action against Mohammed and

Dhiyaa Aljibouri;[1] Jason Chebat; Christopher Gerrid; Michael Grochala; Paul Michael;

Bouncyhop.com, LLC ("Bouncyhop"); US Express Logistics, LLC ("Express Logistics");

"John Doe"; and "XXX, LLC."  Docket Item 1.  The complaint asserts fifteen causes of

action under the Lanham Act, the Racketeer Influenced and Corrupt Organizations Act

("RICO"), and New York State law.  *See id.*

On April 1, 2022, the named defendants moved to dismiss the complaint for

failure to state a claim.  Docket Item 28.  After the plaintiffs responded, Docket Item 47,

the defendants replied, Docket Item 49.  The plaintiffs also moved to amend the

complaint, Docket Item 48, attaching a proposed amended complaint, Docket Item 48-2,

and the parties briefed that motion, Docket Items 50 and 53.  On March 6, 2025, the

_____

[1] Throughout this opinion, for the sake of clarity, the Court refers to each of the
Aljibouris by their first and last names.

Court heard oral argument on the pending motions and reserved decision.  *See* Docket Item 59.

For the reasons that follow, the defendants' motion to dismiss is granted, and the plaintiffs' motion to amend their complaint is denied.

## BACKGROUND[2]

## I.    ALLEGATIONS OF THE ORIGINAL COMPLAINT

The plaintiffs—Tentandtable and Zoom Blowers— "operate . . . business[es]" that "sell[], deliver[,] and distribute[] various inflatable products such as bounce houses[,] water slides, and . . . air blowers used to inflate such products."  Docket Item 1 at ¶¶ 1-2, 16.  They "also sell party tents, pole tents, [and] banquet tents with associated tables and chairs."  *Id.* at ¶ 16.

Both companies "have been in business for over [25] years and have . . . made significant investment[s] of time and resources to build their brands and proprietary place in the market as . . . leader[s] in quality products and customer service."  *Id.* at ¶ 17.  Indeed, the plaintiffs possess "exclusive trademark rights to various products and names in the commercial inflatable market," including "Zoom Blowers," "'Pogo' inflatables," and "PartyTentsDirect.com."  *Id.* at ¶ 18.  In addition, the plaintiffs "created, introduced[,] and have long marketed a black and yellow housing for an air blower."  *Id.*

---

[2] The following facts are taken from the complaint, Docket Item 1, and its attached exhibits.  Where noted, the facts also are taken from the proposed amended complaint, Docket Item 48-2, and its attached exhibits.  On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff (or, as here, the plaintiffs).  *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

at ¶ 19.  Those air blowers "have been sold in interstate commerce for many years" and "have become known in the market" based on their "distinctive appearance."  *Id.* at ¶ 20. The plaintiffs' trademark registration application "for the yellow and black color scheme" is pending before the United States Trademark Office.  *Id.* at ¶ 19.

Defendant Mohammed Aljibouri began working at Tentandtable as a "warehouse supervisor" in October 2019.  *Id.* at ¶¶ 24-25.  In that capacity, he was in charge of "shipping, receiving, and inventory" for both of the plaintiffs.  *Id.* at ¶ 25.  More specifically, he had login credentials to a program called "Ware2Go," which he used to "manage inventory and direct deliveries" for the plaintiffs across a "nationwide system of warehouses."  *Id.* at ¶¶ 27-28.

On November 5, 2021, Mohammed Aljibouri "abruptly quit his employment . . . by text message."  *Id.* at ¶ 24.  After that sudden exit, "the [p]laintiffs conducted various inventory reviews and noticed [a number of] discrepancies and irregularities."  *Id.* at ¶ 29.  For example, they discovered that Mohammed Aljibouri had been "entering orders" and "making deliveries" of the plaintiffs' goods for which they had no record and had not been paid.  *Id.* at ¶¶ 30-31.  He also had "stole[n] . . . property" from the plaintiffs' warehouse.  *Id.* at ¶ 35.  And even after he left, he made unauthorized orders through the Ware2Go system by "signing in as . . . Tentandtable . . . representative user kevinc@tentandtable.com."[3]  *Id.* at ¶ 32.

---

[3] By tracing the IP address of the user who had made the unauthorized orders, the plaintiffs were able to determine that the user was located in North Tonawanda, New York, where Mohammed Aljibouri lives.  Docket Item 1 at ¶ 32.  The plaintiffs "are not aware of any legitimate account user who would have signed in from North Tonawanda."  *Id.* at ¶ 33.

Defendant Dhiyaa Aljibouri, Mohammed Aljibouri's brother, "own[s], operate[s,] and manage[s]" defendant Express Logistics, a "trucking, shipping[,] and transporting goods" business.  *Id.* at ¶ 36.  The Aljibouris, Express Logistics, and "other [d]efendants loaded products stolen and/or converted from [the p]laintiffs onto . . . trucks" owned by Dhiyaa Aljibouri and Express Logistics and "shipped those products across state lines to be used and sold in interstate commerce."  *Id.* at ¶ 37.  And along with defendant Chebat, Mohammed Aljibouri created defendant Bouncyhop, which the defendants also have used to "sell the stolen and converted goods."  *Id.* at ¶ 39.  The remaining three defendants—Gerrid, Grochala, and Michael—"represent themselves as agents and salespeople of Bouncyhop and are believed to be part of the conspiracy and illegal acts perpetrated against the [p]laintiffs."  *Id.* at ¶ 43 (some capitalization omitted); *see* Docket Item 1-6 (screenshots of Facebook posts from Gerrid and Grochala advertising goods on behalf of Bouncyhop).

Through these channels, the defendants have sold the plaintiffs' products, which "bear[] the [p]laintiffs' names and trademarks[,] including Tentandtable.com, Zoom Blowers, Pogo Bounce House[,] and Partytentsdirect.com."  *Id.* at ¶ 44; *see also id.* at ¶¶ 45-59 (explaining that plaintiffs "arranged for" purchasers to buy from defendants and that those purchasers were sent "stolen merchandise acquired and converted by [the d]efendants" that "b[ore] the [p]laintiffs' trademarks").  The defendants also have sold yellow and black air blowers that look "similar[]" to the plaintiffs' air blowers.  *See id.* at ¶¶ 153-54.

## II.    ALLEGATIONS OF THE PROPOSED AMENDED COMPLAINT

The proposed amended complaint largely reiterates the allegations of the first complaint with a few corrections and additions.  *Compare* Docket Item 1, *with* Docket Item 48-2.  First, the proposed amended complaint withdraws the claims against one defendant, Michael, and states that the defendant named as "Christopher Gerrid" is actually named "Christopher Stymus."  Docket Item 48-2 at 1-2.[4]  The proposed amended complaint adds that Jason Chebat is known as George Chebat as well.  *Id.*

The proposed amended complaint then provides some detail about the plaintiffs' air blowers—stating, for instance, that the plaintiffs "began using [the] distinctive [yellow and black] color design on [their b]lowers . . . in interstate commerce and through e-commerce channels . . . as early as March[] 2015."  *Id.* at ¶ 21.  Further, the "[p]laintiffs' advertising and marketing materials have showcased the . . . unique yellow and black color design," which "has become distinctive in the minds of relevant customers and has acquired secondary meaning through [the p]laintiffs' extensive and continuous use."  *Id.* at ¶ 22.  Moreover, the blowers' design is "non-functional and serv[es] primarily to identify [the p]laintiffs as the [blowers'] supplier."  *Id.* at ¶ 23.

The plaintiffs say that Bouncyhop's "blowers bear an identical color design to" theirs and "are sold through overlapping channels of trade to the same customers" in the "inflatable rental industry."  *Id.* at ¶¶ 53, 57; *see also id.* at ¶¶ 54-56, 58, 85.  And the proposed amended complaint adds that defendants Stymus and Grochala are not just Bouncyhop's "agents and salespeople"; rather, they "actively sold [the p]laintiffs' products through social media posting[s], telephone calls[,] and email contact with

---

[4] Page numbers in docket citations refer to ECF pagination.

customers" even though they "knew or should have known that the products . . . were not lawfully acquired." *Id.* at ¶ 59. Indeed, those defendants even "used false names in their advertising and marketing . . . in an effort to distance themselves from Bouncyhop's scheme and activities." *Id.* at ¶ 60 (some capitalization omitted).

The proposed amended complaint also provides more detail about the defendants' alleged scheme to sell the plaintiffs' stolen goods. *See, e.g.*, *id.* at ¶¶ 41-42. For example, it attaches a "[b]ill of [l]ading" dated October 20, 2021, that "lists [Express Logistics'] address," showing that the company served as a carrier in the shipment of goods stolen from the plaintiffs. *Id.*; *see* Docket Item 48-3 at 4-7.

Finally, the proposed amended complaint adds details about Mohammed Aljibouri's central role in the scheme. For instance, it says that Mohammed Aljibouri "actively misrepresented his loyalty to [Tentandtable] as an employee, while . . . manipulat[ing] the [p]laintiffs' inventory" and "remov[ing] hundreds of items . . . to start [a] competitor [business]," Bouncyhop. Docket Item 48-2 at ¶¶ 47-48. In fact, while he was still employed by Tentandtable, Mohammed Aljibouri worked with Bouncyhop and Chebat to "beg[i]n setting up warehouse contracts . . . with Red Stag Fulfillment, LLC, to receive [the] stolen products," and he began actually "selling [those] products." *Id.* at ¶¶ 46, 50; *see* Docket Item 48-3 at 8. And the proposed amended complaint alleges that Mohammed Aljibouri's "hacking into [the] Ware2Go system to fill [Bouncyhop's] orders . . . evidences an intent to continue the illegal enterprise even after the stock of physically stolen property was sold off." Docket Item 48-2 at ¶ 112.

## III.    THE PLAINTIFFS' CLAIMS

In both the complaint and the proposed amended complaint, the plaintiffs assert fifteen claims against the defendants.[5]  More specifically, they assert: (1) claims related to trademark and trade dress infringement under the Lanham Act and New York State common law, Docket Item 1 at ¶¶ 60-77, 118-23, 130-35, 152-66 (first, second, eighth, tenth, thirteenth, and fourteenth claims); *see also* Docket Item 48-2 at ¶¶ 78-96, 137-42, 150-55, 173-88; (2) a claim under RICO, Docket Item 1 at ¶¶ 78-98 (third claim); *see also* Docket Item 48-2 at ¶¶ 97-117; and (3) a number of other state law claims, Docket Item 1 at ¶¶ 99-109, 124-29, 136-51, 167-72 (fourth, fifth, sixth, ninth, eleventh, twelfth, and fifteenth claims); *see also* Docket Item 48-2 at ¶¶ 118-28, 143-49, 156-72, 189-96.[6] They seek injunctive relief prohibiting the defendants "from directly[] or indirectly[] utilizing the [p]laintiffs' names, products, . . . [t]rademarks, . . . [or] the yellow and black design of [the plaintiffs'] air blowers, or any similar variation[]," as well as compensatory damages, punitive damages, and attorney's fees and costs.  Docket Item 1 at ¶¶ 70, 77, 98, 109, 123, 129, 135, 142, 151, 158, 166; *see also* Docket Item 48-2 at ¶¶ 89, 96, 117, 128, 142, 149, 155, 162, 172, 179, 188.  They also seek the return of their property and specific injunctive relief against Bouncyhop, including the appointment of a receiver for, and an accounting of, that company.  Docket Item 1 at ¶¶ 102, 104, 172; *see also* Docket Item 48-2 at ¶¶ 121, 123, 195.

---

[5] The original complaint asserts all claims against all defendants.  Docket Item 1 at 10-31.  In contrast, the proposed amended complaint specifies the defendants against which each of the claims is brought.  Docket Item 48-2 at 13-36.

[6] The plaintiffs also seek to pierce Bouncyhop's corporate veil.  *Id.* at ¶¶ 110-17 (seventh claim); *see also* Docket Item 48-2 at ¶¶ 129-36.

## LEGAL PRINCIPLES

A complaint is properly dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) if it does not include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

### I.    LANHAM ACT

The plaintiffs assert claims for trademark infringement, trade dress infringement, and false designation of origin under sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a). Docket Item 1 at ¶¶ 60-77, 152-58; *see also* Docket Item 47 at 8-12. To state a claim under those sections, a plaintiff must allege "that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." *Shandong Shinho Food Indus. Co. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 247 (E.D.N.Y. 2021) (alteration and internal quotation marks omitted) (quoting *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020)); *Deep Foods Inc. v. Deep Foods Inc.*, 419 F. Supp. 3d 569, 578 (W.D.N.Y. 2019) (similar); *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003)

(explaining that claims under sections 32 and 43(a) are "analyzed under [a] two-prong test" that "looks first to whether the plaintiff's mark is entitled to protection, and second to whether [the] defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods").

The plaintiffs' trademark-related claims can be divided into two categories. First, they assert claims for trademark infringement and false designation of origin, alleging that the defendants have marketed and sold the plaintiffs' trademarked goods—that is, goods that the defendants stole from them. *See* Docket Item 1 at ¶¶ 18, 44, 51-52, 57-59; *see also* Docket Item 28-2 at 13-16; Docket Item 47 at 8-10. Second, the plaintiffs assert claims for trade dress infringement, alleging that the defendants have marketed and sold air blowers that look confusingly "similar[]" to the plaintiffs' "yellow and black" air blowers. *See* Docket Item 1 at ¶¶ 19-20, 152-54; *see also* Docket Item 28-2 at 16-18; Docket Item 47 at 10-11. The Court examines each set of claims in turn.

### A. Trademark Infringement and False Designation of Origin

The defendants argue that the plaintiffs have failed to state a Lanham Act claim based on the alleged sale of goods stolen from the plaintiffs. Docket Item 28-2 at 13-15. Indeed, they say, "the sole basis for [these] claims is that Bouncyhop sold products bearing [the p]laintiffs' trademarks." *Id.* at 15. But, the defendants contend, that alone does not violate the Lanham Act, and they say that the plaintiffs do not provide any specific facts showing that they "falsely advertised" any product or spread any "false message" in their marketing. *Id.* at 16.

The Second Circuit has explained that "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not

9

authorized by the mark owner." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992) ("*Polymer Tech. I*") (footnote omitted), *as amended* (Nov. 25, 1992); *see also Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) (Holmes, J.) ("[A trademark] does not confer a right to prohibit the use of the word or words. It is not a copyright. . . . A trade[]mark only gives the right to prohibit the use of it so far as to protect the owner's good[]will against the sale of another's product as his [own].").  "Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement." *Polymer Tech. I*, 975 F.2d at 62.  And that is true whether or not the distributor came to possess the goods legitimately.  *See ML Fashion, LLC v. Nobelle GW, LLC*, 2022 WL 313965, at *16-18 (D. Conn. Feb. 2, 2022).

A distributor who sells the trademarked goods of another may nonetheless be liable under the Lanham Act under certain circumstances.  More specifically, selling goods that have been altered so that they "do not meet the trademark owner's quality control standards"—or failing "to observe a restrictive condition on the sale of a product"—and thereby causing "consumer confusion" may violate the act.  *See Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78, 80 (2d Cir. 1994) ("*Polymer Tech. II*"); *see also Kitty Walk Sys., Inc. v. Midnight Pass Inc.*, 460 F. Supp. 2d 405, 407-08 (E.D.N.Y. 2006).  Moreover, the sale of genuine goods under the seller's own name—rather than the goods' trademarked name—may violate the Lanham Act if customers are confused about the source of the goods.  *See Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994); *DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 414 (E.D.N.Y. 2021).  On the other hand, the "repackaging of goods is not trademark infringement if it does not deceive the public or damage the mark owner's goodwill."  *See Polymer Tech.*

10

*I*, 975 F.2d at 62; *see also Prestonettes*, 264 U.S. at 366-69 (holding that it did not violate Lanham Act for defendant company to purchase plaintiff's genuine products and resell them with a label indicating that contents included plaintiff's products in repackaged form); *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 126, 128-31 (1947) (defendant's sale of "repaired or reconditioned ['Champion'] plugs" did not infringe upon "Champion" trademark when items were "clearly and distinctively sold as repaired or reconditioned rather than new").

The plaintiffs say that the defendants, through Bouncyhop, resold goods stolen from the plaintiffs and that those goods were sold under the plaintiffs' trademarked names. *See* Docket Item 1 at ¶ 30, 34, 40-41, 44-45; *see also id.* at ¶ 38 (stating that Mohammed Aljibouri "perpetrated a scheme to defraud the [p]laintiffs and conspired with others in order to steal [the p]laintiffs' products and resell them for [the defendants'] own profit"). The proposed amended complaint repeats these assertions. *See* Docket Item 48-2 at ¶¶ 33, 37, 45, 51, 61-62.

Without more, that does not state a claim under the Lanham Act. The plaintiffs' trademark infringement claims are premised on their contention that "any person or entity selling and distributing products bearing the[ plaintiffs'] trademarks without the[ir] express permission is in violation of the[ir] rights" under the Lanham Act. Docket Item 1 at ¶ 23; Docket Item 48-2 at ¶ 26. But that is—as a legal matter—simply incorrect. *See Polymer Tech. Corp. II*, 37 F.3d at 80. Without factual allegations of consumer confusion, the mere fact that the defendants sold the plaintiffs' goods with the plaintiffs' trademarks without their permission is not enough to state a Lanham Act claim. *Id.*; *Kitty Walk Systems*, 460 F. Supp. 2d at 407 (holding that "a trademark owner lacks the

11

ability to bar resale of his trademarked item" and that "any such resale is neither trademark infringement nor unfair competition, so long as the mark 'is used in a way that does not deceive the public'" (quoting *Prestonettes*, 264 U.S. at 368)).

The plaintiffs do not allege any specific facts suggesting that any defendant altered the goods, misrepresented them, or otherwise caused "consumer confusion." *See Polymer Tech. Corp. II*, 37 F.3d at 80; *see generally* Docket Items 1 and 48-2. Indeed, their allegations of "consumer confusion" in the original complaint are entirely conclusory.[7]  *See e.g.*, Docket Item 1 at ¶¶ 66-67 (stating, without further factual elaboration, that defendants' representations "are likely to cause confusion . . . and to deceive the general public with respect to [the p]laintiffs' products"); *id.* at ¶ 72 ("The [d]efendants' aforesaid use of [the p]laintiffs' names and trademarks was willful and was and is intended to cause actual confusion and said conduct is likely to continue to cause

---

[7] In their opposition to the motion to dismiss, the plaintiffs say that "[the d]efendants have engaged in product infringement by falsely designating [the plaintiffs'] goods to inaccurately suggest that [the p]laintiff[s are] selling the goods."  Docket Item 47 at 10.  In fact, they say, their complaint "attached photographs of products sold by the [d]efendants that contain the trademarks in question that Bouncyhop purported as [its] own."  *Id.*  But this argument cannot carry the day for several reasons.  For one thing, these contentions are utterly inconsistent:  In the first sentence, the plaintiffs allege that the defendants have violated the Lanham Act because they have inaccurately represented that the plaintiffs are selling the stolen goods.  *See id.*  In the next breath, the plaintiffs say almost precisely the opposite:  that the defendants (or at least Bouncyhop) have violated the Lanham Act by "purport[ing]" that the plaintiffs' trademarks are Bouncyhop's.  *See id.*  Second, even if those contradictory allegations can be forgiven as alternative pleading, the assertions are made in the response to the motion to dismiss, not in the complaint, and so this Court has no obligation to consider them.  *See Regan v. Vill. of Pelham*, 2021 WL 1063320, at *5 (S.D.N.Y. Mar. 19, 2021).  Third, the photos to which the plaintiffs refer do not support their contentions:  That is, the images do not show the defendants presenting the plaintiffs' goods as Bouncyhop's nor do they show the defendants representing themselves as either of the plaintiffs.  Instead, those photos simply show images of the plaintiffs' products that, according to the complaint, were shipped by the defendants.  *See* Docket Items 1-9 and 1-11.

confusion, mistake, and deception as to the origin of [the d]efendants' activities and as to the sponsorship or approval of [the d]efendants' activities."); *see also* Docket Item 48-2 at ¶¶ 84, 86, 91 (same).

The proposed amended complaint tries to buttress those assertions by adding an allegation that the "[d]efendants market specifically to those in the inflatable rental industry." Docket Item 48-2 at ¶ 85. "Therefore," the proposed amended complaint says,

> by shipping [the p]laintiffs' products to these customers, the[ defendants] intend to, and will actually, create confusion as to an association between the [p]laintiffs and [the d]efendants. As those in the inflatable rental industry become repeat buyers in order to restock and replace their inventory, the [d]efendants are misusing [the p]laintiffs' stolen products in order to appropriate [the p]laintiffs' trademarks and goodwill. [The d]efendants' scheme and misuse of [the p]laintiffs' trademarks is intended to lead customers to [the d]efendants who would otherwise seek out the [p]laintiff[s].

*Id.* But that is simply another way of pleading that the defendants are violating the plaintiffs' trademark rights by selling the plaintiffs' genuine goods under the plaintiffs' trademarks. Again, the plaintiffs do not allege that the defendants are misrepresenting the nature of the products in any way; rather, they say only that the defendants are selling products that the defendants have no right to sell.[8] *See id.*; *see also id.* at ¶ 83 (alleging that "[the d]efendants have used [the p]laintiffs' protected names unlawfully and for their own benefit and to [the p]laintiffs' detriment").

---

[8] Indeed, while the proposed amended complaint says that some of the defendants—Gerrid/Stymus and Grochala—are misrepresenting their own names in marketing, it does not say that they are misrepresenting the products themselves. *See* Docket Item 48-2 at ¶ 60.

Courts have rejected Lanham Act claims based on similar allegations. For example, in *Burton v. Label, LLC*, 344 F. Supp. 3d 680 (S.D.N.Y. 2018), Label, LLC ("Label"), brought Lanham Act counterclaims against its former employee, alleging that the former employee had "use[d] his position as a Label salesman to sell items represented to be Label goods by placing orders with Label suppliers" and then keeping the profits for himself. *Id.* at 701. The court found that the alleged conduct was not actionable under the Lanham Act because the former employee "was simply unlawfully pocketing proceeds that belonged to his employer; he was not falsely representing the origin of his own goods." *Id.* And "[s]elling trademarked goods under [their] trademarked name," the court reasoned, "is not a violation of the Lanham Act." *Id.*; *see also S & L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F.Supp.2d 188, 202 (E.D.N.Y. 2007) ("[W]here a 'purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation' under the Lanham Act." (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995))).

Somewhat similarly, in *ML Fashion*, the plaintiff, a clothing company, asserted Lanham Act claims based on allegations that the defendant, another clothing company, had "stole[n the plaintiff's] goods and started selling them." 2022 WL 313965, at *16. The plaintiff did "not allege that [the defendant had] altered the merchandise in any way." *Id.* Rather, its false advertising claim was based on "the fact that [the defendant wa]s selling products that [we]re not [its] to sell and, in the case of [certain] items, products [that] it d[id] not have the authority to sell," and the plaintiff argued this constituted a "false statement [by] implication." *Id.* The court rejected these claims,

14

holding that "the mere selling of the products does not make any statement, let alone the statement [the p]laintiffs seek to . . . imply—namely, that the goods [the defendant] sells belong to [the defendant]." *Id.* at *15-17.  And the court likewise rejected the plaintiff's claim under the Lanham Act for unfair competition.  *See id.* at *17-18.  Such a claim did not lie, the court explained, because the complaint focused "entirely on disputed ownership of the goods being sold [and was] devoid of any [allegations that the defendant made] any affirmative false representation or . . . altered [the products sold] in any way." *Id.* at *18.

Those cases guide this Court's analysis here.  The plaintiffs' trademark infringement and false designation of origin claims boil down to claims that the defendants violated the Lanham Act simply by selling stolen goods.  *See generally* Docket Items 1 and 48-2.  And that is simply not sufficient.  Indeed, as this Court pointed out at oral argument, if the allegations here were enough to state a claim under the Lanham Act, then it would seem that any distributor—say, Target—that sells genuine goods under their trademarked names could be liable under the Lanham Act should there be a dispute about ownership.  *Cf. Champion Spark Plug Co.*, 331 U.S. at 129 ("[W]e would not suppose that one could be enjoined [under the Lanham Act] from selling a car whose valves had been reground and whose piston rings had been replaced unless he removed the name Ford or Chevrolet.").

In sum, while the plaintiffs' allegations regarding the sale of stolen property might well state a claim for conversion or some other tort, such claims, without more, do not fall within the Lanham Act's purview.  The plaintiffs' claims for trademark infringement and false designation of origin therefore are dismissed.  And because nothing in the

15

plaintiffs' proposed amended complaint remedies the deficiencies discussed above, the plaintiffs' motion to amend those claims is denied.

### B.   Trade Dress Infringement

The plaintiffs next allege that the defendants have infringed upon their protected trade dress in violation of the Lanham Act by "advertis[ing], promoti[ng,] and s[elling]" air blowers with the plaintiffs' distinctive "yellow and black design."[9]  Docket Item 1 at ¶¶ 19-20, 152-57; *see* Docket Item 48-2 at ¶¶ 18-23; 173-178.

"Section 43(a) of the Lanham Act protects trade dress."  *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 121 (2d Cir. 2025) (quoting *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001)).  While "trade dress" originally referred only to "the packaging of products, courts have expanded its meaning to also encompass 'the design or configuration of the product itself.'"  *Id.* (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001)).  "At the same time, however, 'courts have exercised particular caution when extending protection to product designs,' because carelessly granting protection to ordinary product designs 'would create a monopoly in the goods themselves' and 'hamper efforts to market competitive goods.'"  *Id.* (some internal quotation marks omitted) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997)).

---

[9] The plaintiffs assert trade dress claims based on the "[d]efendants' advertisement, promotion, and sale of" the plaintiffs' yellow and black air blowers as well as "similar looking [air blowers]."  Docket Item 1 at ¶¶ 153-54; *see also* Docket Item 48-2 at ¶¶ 174-75.  To the extent the plaintiffs' claims are based on the defendants' marketing and sale of the plaintiffs' *own* air blowers, those claims are dismissed and the motion to amend them is denied for the same reasons described in Section I.A, *supra*.

16

In light of those concerns about competition, both the Supreme Court and the Second Circuit "have crafted specific pleading requirements for trade dress infringement claims based on product design." *Id.*; *see Yurman Design*, 262 F.3d at 115. As an initial matter, the plaintiff in such a case "must . . . offer 'a precise expression of the character and scope of the claimed trade dress.'" *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (summary order) (quoting *Landscape Forms*, 113 F.3d at 381); *see also Cardinal Motors*, 128 F.4th at 116 ("[The Second Circuit] ha[s] long required plaintiffs pleading claims of trade dress infringement under the Lanham Act to articulate precisely the features of their trade dresses."). The plaintiff "must [then] allege that (1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion between the plaintiff's good and the defendant's." *Sherwood*, 76 F. App'x at 391; *see Yurman Design*, 262 F.3d at 115-16.

The defendants argue that neither the complaint nor the proposed amended complaint includes facts sufficient to state a claim for trade dress infringement. Docket Item 28-2 at 16-18; Docket Item 50 at 17-18. More specifically, the defendants argue that the plaintiffs have failed to "articulate the elements" of their claimed trade dress with the requisite specificity and that they have failed to allege facts showing that their trade dress is "distinctive." Docket Item 28-2 at 16-18; *see* Docket Item 50 at 17-18. The Court examines each of those arguments below.[10]

---

[10] In *Cardinal Motors,* decided just last month, the Second Circuit "clarif[ied] that distinctiveness"—the second required element to plead a trade dress claim involving a product design—"is independent of the articulation requirement." 128 F.4th at 124. As the court explained, "[d]istinctiveness is an *element* of a trade dress infringement claim to be pleaded in a complaint and shown at trial," whereas "[t]he articulation requirement

### 1.    Articulation Requirement

The articulation requirement is the first hurdle facing a plaintiff who raises a trade dress infringement claim based on product design.  To clear it, the plaintiff must "offer 'a precise expression of the character and scope of the claimed trade dress.'"  *Sherwood*, 76 F. App'x at 391 (quoting *Landscape Forms*, 113 F.3d at 381); *see Cardinal Motors*, 128 F.4th at 125 ("[A] plaintiff satisfies the articulation requirement by listing with precision the features that comprise its trade dress.").  That articulation is integral to the litigation process because, as the Second Circuit has explained, "[w]ithout such a precise expression of the character and scope of the claimed trade dress, . . . courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market."  *Landscape Forms*, 113 F.3d at 381.  Further, "without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings."  *Yurman Design*, 262 F.3d at 117.  And "[c]ourts will . . . be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection."  *Landscape Forms*, 113 F.3d at 381.

---

. . . is a pleading requirement under which plaintiffs must articulate precisely the *components* that compose their claimed trade dress."  *Id.*  The court thus held that "the district court [had] erred by incorporating a distinctiveness requirement into its articulation analysis"; ruled that the plaintiff in the case had satisfied the articulation requirement; and remanded the case for the district court to determine whether the plaintiff adequately had pleaded the three elements of a trade dress claim.  *Id.* at 125-27; *see also id.* at 126-27 (noting the "narrow[ness]" of its holding and stating that "the district court is free to consider the other issues it outlined in its opinion—namely, distinctiveness"—on remand).  Consistent with *Cardinal Motors*, this Court is careful to keep its analyses of the articulation requirement and the distinctiveness element separate.

This Court is skeptical that the plaintiffs have provided the requisite articulation here. Both the complaint and the proposed amended complaint repeatedly refer to the air blowers' yellow and black "design[]," "configuration," "scheme," and "appearance." *See* Docket Item 1 at ¶¶ 19-22; Docket Item 48-2 at ¶¶ 18-25. But those pleadings provide almost no details about that "design[]," "configuration," "scheme," and "appearance," saying little more than that the product is "yellow and black."[11] *See* Docket Item 1 at ¶¶ 19-22; Docket Item 48-2 at ¶¶ 18-25. In fact, the plaintiffs' most precise articulation of the claimed trade dress is their statement in the attached trademark application that "the fan housing is yellow and the motor housing i[s] black." *See* Docket Item 1-2 at 2.

The Second Circuit has held that a "focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its [trade] dress." *Landscape Forms*, 113 F.3d at 381; *Cardinal Motors*, 128 F.4th at 124. Thus, a plaintiff's "conclusory reliance on the entire look of the product does not fulfill [its] obligation to offer 'a precise expression of the character and scope of the claimed trade dress' under *Sherwood* and *Landscape Forms*." *Nat'l Lighting Co. v.*

---

[11] The proposed amended complaint also alleges that the air blowers "come in several horsepower and motor size options," but it does not identify that aspect as a part of the claimed trade dress. *See* Docket Item 48-2 at ¶¶ 18-24. That is for good reason: Such features would appear to be functional and thus could not provide the basis for a trade dress claim. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (referring to "well-established rule that trade dress protection may not be claimed for product features that are functional"); *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 182 (2d Cir. 2021) ("In [the Second] Circuit, 'a product feature is considered to be functional in a utilitarian sense if it is (1) essential to the use or purpose of the article, or if it (2) affects the cost or quality of the article.'" (some internal quotation marks omitted) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 219 (2d Cir. 2012))).

*Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 562 (S.D.N.Y. 2009) (some internal quotation marks omitted) (quoting *Sherwood*, 76 F. App'x at 391); *see also Yurman Designs*, 262 F.3d at 117-18 (plaintiff failed to offer precise articulation when it identified trade dress only as "the artistic combination of cable jewelry with other elements" (alteration omitted)).

In *Sherwood*, for example, the plaintiffs identified their trade dress as "both 'the configuration' of . . . three [particular] buildings and the advertising and signage display on the faces of th[os]e buildings." 76 F. App'x at 391. A panel of the Second Circuit held that "description" to be "inadequate" because the plaintiffs were "plainly seek[ing] to protect the 'overall look' of each of the buildings, and . . . fail[ed] to identify the specific elements that comprise[d] each building's identifiable trade dress." *Id.* Likewise, in *Tooker v. Whitworth*, 212 F. Supp. 3d 429 (S.D.N.Y. 2016), the plaintiffs identified the trade dress as "includ[ing] the size, shape[,] and color of [hats] and [their] packaging" and consisting of the "unique elements of style, shape, angle, height, width, and/or slant" of the hats. *Id.* at 434. The court held that was not enough. *Id.*; *see also Shevy Custom Wigs, Inc. v. Aggie Wigs*, 2006 WL 3335008, at *5 (E.D.N.Y. Nov. 17, 2006) (holding that plaintiff wig company did not offer precise articulation of trade dress when it offered "sweeping descriptions [that] . . . in fact denote[d] categories of features, not the features themselves" (internal quotation marks omitted)).[12]

---

[12] Both *Tooker* and *Shevy Custom Wigs* predate *Cardinal Motors*, and both collapse the "articulation" and "distinctiveness" inquiries. *See Tooker*, 212 F. Supp. 3d at 434 (stating that to satisfy articulation requirement, plaintiff must specify "*which* features are distinctive" and "*how* they are distinctive" (quoting *Heller Inc. v. Design Within Reach, Inc.*, 2009 WL 2486054, at *6 (S.D.N.Y. Aug. 14, 2009))); *Shevy Custom Wigs*, 2006 WL 3335008, at *5 ("The issue is not just *which* features are distinctive, but also *how* they are distinctive."). Nevertheless, those decisions found that each of the

In contrast, courts have held that plaintiffs' descriptions satisfied the articulation requirement when they "recited in specific detail the geometric and aesthetic characteristics of [their] trade dress." *Urb. Intel. Inc. v. Spring Scaffolding LLC*, 2024 WL 4350613, at *3 (E.D.N.Y. Sept. 30, 2024) (collecting cases). For instance, in *Cardinal Motors*, the plaintiff alleged that its protected trade dress "consist[ed] of several specific attributes, features, and design details" of a motorcycle helmet. 128 F.4th at 125. More specifically, it cited the following: a "curved top," a "thin chin protector," a "relatively large eyeport height (compared to the height of the chin protector)," "a single-level non-stepped chin bar surface," "a thin chin bar height substantially thinner than the eyeport," and "a large diameter pivot point escutcheon." *Id.* The Second Circuit held that this "articulation [wa]s sufficiently precise as to the specific combination of components that comprise[d the claimed] trade dress." *Id.*

The plaintiffs certainly do not offer the same level of precision here. *See* Docket Item 1 at ¶¶ 19-22; Docket Item 48-2 at ¶¶ 18-25. They nonetheless contend, in response to the defendants' motion to dismiss, that the complaint "adequately describes . . . the protected trade dress." Docket Item 47 at 11. But they cite no case in which a

---

prongs of that requirement, so stated, were not met—that is, that the plaintiffs in those cases failed to identify which features were part of their claimed trade dress and how they were distinctive. *See Tooker*, 212 F. Supp. 3d at 434; *Shevy Custom Wigs*, 2006 WL 3335008, at *5. And so in that sense, the decisions are still relevant to this Court's analysis of the articulation requirement which—consistent with *Cardinal Motors*—considers only whether the plaintiffs' articulation is sufficiently precise, and not whether the features identified are sufficiently distinct. *See supra* note 10.

court held that a description as sparse as the one they have provided was deemed adequately precise—and for its part, this Court could not find any.[13]  *See id.*

The plaintiffs also say that they have satisfied the articulation requirement because the complaint "attaches an illustration of" their claimed trade dress.  *Id.*; *see* Docket Item 1-2 at 11-13 (pictures of plaintiffs' air blower).  But the images the plaintiffs attached to the complaint do not relieve them of their obligation to precisely articulate the trade dress that they seek to protect.  As explained above, a plaintiff cannot evade the imperative to define the claimed trade dress with specificity by referring to the "overall look" of the product.  *See Landscape Forms*, 113 F.3d at 381.  And courts have specifically held that "images alone do not satisfy the plaintiff's obligation to articulate the distinctive features of the trade dress."  *NSI Int'l, Inc. v. Horizon Grp. USA, Inc.*, 2021 WL 3038497, at *6 (S.D.N.Y. July 16, 2021); *cf. Nat'l Lighting Co.*, 601 F. Supp. 2d at 562-63 ("Courts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional.").

Having said all that, this Court is cognizant of the Second Circuit's recent admonition that "a plaintiff that articulates the components of its trade dress with the requisite precision should not have its claims prematurely dismissed" regardless of whether the trade dress claimed is sufficiently distinctive.  *Cardinal Motors*, 128 F.4th at 125.  And the Court notes that the plaintiffs have provided *some* degree of specificity here:  They have provided the colors of the design, and they have stated which area of the product is painted with which color.  *Cf. Urb. Grp. Exercise Consultants, Ltd. v.*

---

[13] In fact, the plaintiffs cite no cases whatsoever in support of this proposition. *See* Docket Item 47 at 11.

*Dick's Sporting Goods, Inc.*, 2012 WL 3240442, at *5 (S.D.N.Y. Aug. 7, 2012) (holding that "because the [a]mended [c]omplaint describes the[ trampoline's] black and red color scheme and protective fold skirt that include[s the p]laintiff's trademarked logo, [the p]laintiff ha[d] adequately described its trade dress"). But this Court need not decide whether the plaintiffs' articulation of the claimed trade dress supplies the necessary specificity because, for the reasons described below, *see infra* Section I.B.2, they clearly have not adequately pleaded that their claimed trade dress is distinctive. The Court therefore assumes without deciding that the plaintiffs have met the articulation requirement and proceeds to consider whether the plaintiffs have sufficiently pleaded that the trade dress has the required distinctiveness.

### 2.    Distinctiveness

As discussed above, to sufficiently plead a claim for trade dress infringement based on a product design, a plaintiff must allege that "the claimed trade dress has secondary meaning." *Sherwood*, 76 F. App'x at 391; *see Yurman Design*, 262 F.3d at 115. This element is a specific iteration of the more general requirement that to be protected under the Lanham Act, a mark must be "distinctive." *See Yurman Design*, 262 F.3d at 115. In other words, "[i]n any action under [section] 43(a) [of the Lanham Act], the plaintiff must prove . . . that the mark is distinctive as to the source of the good." *Id.* (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000)).

In most section 43(a) actions—such as when the claimed "mark is a word, symbol[,] or even product packaging"—the plaintiff may show that the mark has either "inherent distinctiveness" or "acquired distinctiveness." *Id.* (quoting *Samara Bros.*, 529 U.S. at 210-11). But when the plaintiff contends that the very design of the product is

23

the trade dress, the burden is more onerous. "The product[-]design plaintiff . . . must always make the second, more difficult showing" of "acquired distinctiveness" or "secondary meaning." *Id.* (citing *Samara Bros.*, 529 U.S. at 213-14). This requires a showing that "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (alteration in original) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n.11 (1982)); *see Yurman Design*, 262 F.3d at 115.

As already noted, the trade dress on which the plaintiffs rely here is largely color: what they say is a distinctive black and yellow design. *See* Docket Item 1 at ¶¶ 19-20; Docket Item 48-2 at ¶¶ 18-22. And that makes the plaintiffs' task harder still: At least one court has held that a "[p]laintiff's contention that a significant feature of its trade dress is its use of . . . colors . . . raises its burden [at the motion to dismiss stage], [because] 'color marks by their very nature are not generally distinctive.'" *Urban Grp. Exercise Consultants*, 2012 WL 3240442, at *7 (emphasis omitted) (quoting *Mana Prods., Inc. v. Columbia Cosms. Mfg., Inc.*, 65 F.3d 1063, 1070 (2d Cir. 1995)).

So because the plaintiffs rely on the design of their products—and largely on the color of that design—as the basis for their trade dress, they have a formidable task in pleading secondary meaning. And they have not met that challenge.

In both the complaint as well as the proposed amended complaint, the plaintiffs assert in conclusory fashion that their trade dress is "distinctive" and has "acquired secondary meaning." *See* Docket Item 1 at ¶¶ 20, 153; Docket Item 48-2 at ¶¶ 19-23, 56, 181-182. But such assertions—which "'amount to nothing more than a formulaic

recitation of the elements' of a trade[ dress] infringement claim"—are not themselves enough. *See Vedder Software Grp. Ltd. v. Ins. Servs. Off., Inc.*, 545 F. App'x 30, 33 (2d Cir. 2013) (summary order) (quoting *Iqbal*, 556 U.S. at 681). And while deciding whether a mark has acquired a secondary meaning is a "factual" question*, see Mana Prods.*, 65 F.3d at 1070, "a plaintiff claiming trade dress protection for a product design must plead facts which would support" a colorable claim that the plaintiff's trade dress has acquired a secondary meaning, *see Urban Grp. Exercise Consultants*, 2012 WL 3240442, at *7 (noting that this pleading requirement stems from the "potent risk" that overextension of trade dress protection "will impermissibly afford a level of protection that would hamper efforts to market competitive goods" (quoting *Yurman Design*, 262 F.3d at 114-15)). Indeed, courts have dismissed complaints under Rule 12(b)(6) that do not allege such facts. *See, e.g., Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 597-601 (E.D.N.Y. 2017); *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011).

To determine whether a mark has acquired a secondary meaning, courts consider six factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Mana Prods.*, 65 F.3d at 1070; *Bubble Genius*, 239 F. Supp. 3d at 598. The allegations of both the complaint and the proposed amended complaint here are silent with respect to the first four of those factors. *See* Docket Items 1 and 48-2. That is, the plaintiffs do not

provide—or even refer to—any information about advertising expenses, consumer studies, media coverage, or specific sales success.[14]  Docket Items 1 and 48-2.

With respect to the fifth factor, the plaintiffs allege in both the complaint and proposed amended complaint that Bouncyhop and the other defendants have attempted to plagiarize their trade dress.  *See, e.g.*, Docket Item 1 at ¶ 154; Docket Item 48-2 at ¶¶ 53, 175.  But they do not say that anyone else has tried to plagiarize or infringe upon their yellow and black air blowers' trade dress.[15]  And courts have found that when a complaint alleges that only the defendants have violated the plaintiff's trade dress, this factor weighs against an inference of secondary meaning.[16]  *See Bubble Genius*, 239 F. Supp. 3d at 600; *Urb. Grp. Exercise Consultants*, 2012 WL 3240442, at *7; *see also*

---

[14] This absence is particularly perplexing because all of this information would seem to be peculiarly within the knowledge of the plaintiffs.  This is not a case in which the plaintiffs' ability to plead the facts with specificity is impeded by the fact that the defendant is the only likely custodian of the relevant information.

[15] In December 2021—before the plaintiffs filed their complaint in this action—one of the plaintiffs here, Tentandtable, commenced an action against Gorilla Bounce LLC ("Gorilla Bounce") for trade dress infringement under the Lanham Act and New York State common law.  *Tentandtable.com, LLC v. Gorilla Bounce LLC*, Case No. 21-cv-1318, Docket Item 1 (W.D.N.Y. Dec. 30, 2021).  Tentandtable alleged that Gorilla Bounce infringed upon its trade dress rights by selling air blowers with its "distinctive yellow and black housing."  *See id.* at ¶ 2.  But the plaintiffs do not refer to that case, to Gorilla Bounce, or to its infringement in the complaint or proposed amended complaint in this action, *see* Docket Items 1 and 48-2, nor do they refer to that case in any of their briefing, *see* Docket Items 47, 48-5, and 53.  So the Court does not address the allegations or findings in that case here.

Further, to the extent that the Court's decision here conflicts with its decision in the *Gorilla Bounce* case, *see Tentandtable.com, LLC v. Gorilla Bounce LLC*, 2023 WL 2342291, at *1 (W.D.N.Y. Mar. 3, 2023), the Court notes that *Gorilla Bounce* was decided on a motion for a default judgment without the benefit of adversarial briefing.

[16] After all, if allegations of the defendant's plagiarism were itself enough, this factor always would weigh in favor of finding acquired secondary meaning.

*APP Grp. (Canada) Inc. v. Rudsak USA Inc.*, 2024 WL 89120, at *3 (2d Cir. Jan. 9, 2024) (summary order) (finding that plaintiff failed to allege acquired secondary meaning when its "allegations of attempts to plagiarize its trade dress [we]re comprised of only a conclusory reiteration of its trade dress infringement claim").  So the fifth factor likewise does not support the plaintiffs' claims here.

As for the sixth factor, the proposed amended complaint states that the plaintiffs have used the claimed trade dress since January 2015—more than seven years before they commenced this action.  Docket Item 48-2 at ¶ 21.  Neither the complaint nor the proposed amended complaint alleges that they have used this design "exclusively," although both refer to the design as "unique."  *See, e.g.*, Docket Item 1 at ¶¶ 19-20; Docket Item 48-2 at ¶¶ 18-23; *see also Urb. Grp. Exercise Consultants*, 2012 WL 3240442, at *7 (plaintiff had not pleaded acquired secondary meaning when it failed to plead "that [it] exclusively use[d] the color scheme alleged").  But even assuming the plaintiffs have sufficiently alleged more than seven years of exclusive use, that would not be enough to state a plausible claim in the absence of any facts relevant to the other factors.  *See Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 343-45 (E.D.N.Y. 2014) (plaintiffs' allegations that it had "continuously, exclusively, and extensively marketed, promoted[,] and sold" product for more than a decade were not enough to plead that product had acquired a secondary meaning in the absence of other facts to support that conclusion); *see also Wonderful Co. LLC v. Nut Cravings Inc.*, 2022 WL 4585344, at *3 (S.D.N.Y. Sept. 29, 2022) (finding that plaintiff did not plead acquired secondary meaning where "[c]omplaint include[d] a conclusory allegation that [plaintiff] ha[d] 'continuously and exclusively used' the trade dress").

27

Under similar circumstances, courts have found that the plaintiffs failed to adequately plead that their claimed trade dress was distinctive.  For instance, in *Bubble Genius*, the complaint—like the pleadings here—was "silent" as to the first four factors; pointed to only the defendant's attempts to infringe; and alleged that the plaintiff had used the trade dress exclusively for several years.  239 F. Supp. 3d at 597-601.  The court granted the defendant's motion to dismiss the trade dress infringement claims.  *Id.* at 601, 605.

Further, in *Heptagon Creations*, the court dismissed the plaintiff's trade dress claims even though the plaintiff arguably pleaded far more—and more relevant—facts in connection with secondary meaning than those offered here.  2011 WL 6600267, at *8.  More specifically, the complaint in that case "contain[ed] allegations that the [plaintiff's] furniture line ha[d] been purchased by celebrities, featured in various magazines, and commissioned for use in the decoration of public and private spaces." *Id.*  But it did not "contain any allegations as to [the plaintiff's] advertising expenditures, or consumer surveys linking the . . . furniture line to a particular source" and did not provide facts about the furniture items specifically at issue in the lawsuit, as opposed to the line as a whole.  *Id.*  The court held that was not enough to plead secondary meaning.  *See id.*; *see also Urb. Grp. Exercise Consultants*, 2012 WL 3240442, at *7 ("Because the [a]mended [c]omplaint fails to allege facts relating to [the p]laintiff's advertising expenditures, consumer surveys, marketing coverage or prior attempts to plagiarize [the p]laintiff's trade dress, [the p]laintiff has failed to adequately allege its trade dress to have acquired a secondary meaning.").

What was true in those cases is true here:  The plaintiffs have not alleged facts

sufficient to support a finding that their claimed trade dress—the yellow and black design of their air blowers—has acquired a secondary meaning.  So they have not stated a claim for trade dress infringement.[17]  And because the proposed amended complaint does not remedy the identified deficiencies, the motion to amend is denied.

## C.    Related State Law Claims

In addition to the Lanham Act claims discussed above, the plaintiffs also assert claims for unfair competition, trademark infringement, and trade dress infringement under New York common law.  Docket Item 1 at ¶¶ 118-23, 130-35, 159-66; Docket

---

[17] Because the plaintiffs have failed to plead secondary meaning—one of the three elements required to state a claim for trade dress infringement—the Court need not decide whether the plaintiffs have sufficiently pleaded the other two elements: non-functionality and likelihood of confusion.

Even if the plaintiffs had sufficiently pleaded secondary meaning, however, this Court would find that they failed to sufficiently allege non-functionality.  "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  *Yurman Design*, 262 F.3d at 116 (quoting *TrafFix Devices*, 532 U.S. at 32).  "And in cases involving an aesthetic feature"—such as color—"the dress is also functional if the right to use it exclusively 'would put competitors at a significant non-reputation-related disadvantage.'"  *Id.* (quoting *TrafFix Devices*, 532 U.S. at 32); *see Christian Louboutin*, 696 F.3d at 222 ("[A] mark is aesthetically functional, and therefore ineligible for protection under the Lanham Act, where protection of the mark *significantly* undermines competitors' ability to compete in the relevant market.").

Neither the complaint nor the proposed amended complaint, *see* Docket Items 1 and 48-2, include any "specific facts"—as opposed to conclusory assertions—"that plausibly support non-functionality," *see Eliya, Inc. v. Steven Madden, Ltd.*, 749 F. App'x 43, 47 (2d Cir. 2018) (summary order).  And so the plaintiffs have not adequately pleaded non-functionality here.  *See id.* (plaintiff did not "allege[] specific facts that plausibly support[ed] non-functionality" when "[r]egarding ornamental features, the [complaint] merely allege[d] that 'there are numerous alternatives where competitive shoes can be constructed differently' and present[ed] images of purported 'alternative designs[]' featuring shoes made in completely different styles" (citation omitted)); *Urb. Grp. Exercise Consultants*, 2012 WL 3240442, at *6 ("[C]onclusory assertions that a product's design is non-functional are insufficient to meet the plaintiff's burden."); *DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 408 (S.D.N.Y. 2009) (same).

Item 48-2 at ¶¶ 137-42, 150-55, 180-88.  They base those claims on the same allegations underpinning their Lanham Act claims.  *Compare* Docket Item 1 at ¶¶ 118-23, 130-35, 159-66, *and* Docket Item 48-2 at ¶¶ 137-42, 150-55, 180-88, *with* Docket Item 1 at ¶¶ 60-77, 152-58, *and* Docket Item 48-2 at ¶¶ 78-96, 173-79; *see also* Docket Item 47 at 12-13.

Courts analyze trademark-related claims under the Lanham Act and the analogous claims under New York common law according to "substantially similar" standards.  *See Deep Foods*, 419 F. Supp. 3d at 578; *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 229 (S.D.N.Y. 2022) (noting that standards are "virtually identical" (quoting *Lopez v. Adidas Am., Inc.*, 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020)), *aff'd*, 2024 WL 1152520 (2d Cir. Mar. 18, 2024).  The only difference is that "New York law requires an additional showing of bad faith."  *Jackpocket*, 645 F. Supp. 3d at 229 (alterations omitted) (quoting *Lopez*, 2020 WL 2539116, at *15).  Indeed, the parties agree that the plaintiffs' Lanham Act and corresponding state law claims stand and fall together here.  *See* Docket Item 28 at 13, 16; Docket Item 47 at 8.

Because this Court has found that the plaintiffs have failed to state a claim under the Lanham Act, *see supra* Section I.A-B, it likewise finds that they have failed to state a claim for unfair competition, trademark infringement, and trade dress infringement under New York common law, and their motion to amend those claims similarly is denied.[18]

---

[18] Because this Court dismisses all of the plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over most of the plaintiffs' state law claims.  *See infra* Section III.  Nonetheless, it addresses the plaintiffs' New York common law unfair competition, trademark, and trade dress infringement claims for the sake of judicial efficiency "because th[ose claims] are decided under nearly indistinguishable standards as the Lanham Act claims."  *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 273 (E.D.N.Y. 2014) (dismissing Lanham Act claims and exercising

*See SLY Mag., LLC v. Weider Publ'ns, LLC*, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007)

("Because plaintiff's claims fail under the Lanham Act, [his] claims necessarily also fail

under New York common law."), *aff'd*, 346 F. App'x 721 (2d Cir. 2009) (summary order).

## II.    RICO

In addition to their trademark-related claims, the plaintiffs assert a civil RICO

claim.  Docket Item 1 at ¶¶ 78-98; *see also* Docket Item 48-2 at ¶¶ 97-117.  They have

filed the required RICO case statement.[19]  Docket Item 1-23; Loc. R. Civ. P. 9 (requiring

any plaintiff asserting a RICO claim to file a RICO case statement with certain specified

information "contemporaneously with the papers first asserting the party's RICO claim").

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO

statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury

was caused by the violation of [s]ection 1962."  *Spool v. World Child Int'l Adoption

Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas,* 244 F.3d 286,

305 (2d Cir. 2001)).  Here, the plaintiffs assert that the defendants have violated

subsections (c) and (d) of the RICO statute.  Docket Item 1 at ¶ 87; Docket Item 48-2 at

¶ 106; Docket Item 1-23 at ¶¶ a, k, l; *see* 18 U.S.C. § 1962(c)-(d).  "To sustain a RICO

claim under 18 U.S.C. § 1962(c), a plaintiff must show '(1) that the defendant (2)

through the commission of two or more acts (3) constituting a "pattern" (4) of

---

supplemental jurisdiction over New York unfair competition claim due to similarity of
standards but declining to exercise supplemental jurisdiction over remaining state law
claims and noting that "nothing in the text of 28 U.S.C. § 1367(c)(3) prevents a [federal
district c]ourt from exercising supplemental jurisdiction over some, but not all, of the
relevant state law claims").

[19] As the defendants point out, Docket Item 50 at 12 n.2, the plaintiffs did not file
a proposed amended RICO case statement with their proposed amended complaint.

"racketeering activity" (5) directly or indirectly . . . participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.'" *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123-24 (2d Cir. 2018) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)). "And to state a RICO conspiracy" claim under section 1962(d), "a plaintiff must allege 'the existence of an agreement to violate RICO's substantive provisions.'" *Id.* at 124 (quoting *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)).

"A plaintiff's burden is high when pleading RICO allegations." *Mackin v. Auberger*, 59 F. Supp. 3d 528, 541 (W.D.N.Y. 2014). "[G]iven RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies," courts "look with particular scrutiny at [civil RICO] claims." *Id.*; *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) ("Because the 'mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" (alterations omitted) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990))); *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267, at *5 (S.D.N.Y. July 31, 2013) (observing that "frivolous RICO allegations are often manifested in the form of 'garden variety fraud or breach of contract cases that some [p]laintiff has attempted to transform into a vehicle for treble damages by resort to what has been referred to as the litigation equivalent of a thermonuclear device'" (alterations and some internal quotation marks omitted) (quoting *Goldfine v. Sichenza*, 118 F. Supp. 2d 392, 394 (S.D.N.Y.2000))).

The defendants say that the plaintiffs' allegations fail to meet that high standard. Indeed, they say, the plaintiffs' RICO-related allegations are "entirely conclusory." Docket Item 28-2 at 18-21.  And they argue that even the plaintiffs' proposed amended complaint "fails to allege facts establishing at least two of [RICO's] elements"—namely, a "pattern" and predicate acts of "racketeering activity."  Docket Item 50 at 10-15.

## A.    Racketeering Activity

"Section 1961(1) sets forth a[] . . . list of predicate 'acts' that can constitute . . . 'racketeering activity.'"  *Williams*, 889 F.3d at 123-24; *see* 18 U.S.C. § 1961(1).  That list is "exhaustive."  *Williams*, 889 F.3d at 123-24; *see Lynch v. Amoruso*, 232 F. Supp. 3d 460, 466 (S.D.N.Y. 2017).  That is, if an offense is not enumerated by section 1961(1), it cannot be a predicate act of racketeering activity for purposes of a RICO claim.  *See Lynch*, 232 F. Supp. 3d at 467.

Here, the plaintiffs allege that the defendants committed the following predicate acts: (1) "conversion of property"; (2) "theft and movement of stolen property"; (3) "mail and wire fraud in receiving and fulfilling orders for and receipt of money for stolen goods through wire fraud"; and (4) "transportation of stolen property through interstate commerce."[20]  Docket Item 1 at ¶ 91; *see* Docket Item 48-2 at ¶ 110.  But as the

---

[20] In their RICO case statement—but not their complaint or proposed amended complaint—the plaintiffs also cite the defendants' alleged Lanham Act violations as predicate offenses under RICO.  *See* Docket Item 1-23 at ¶ e; Docket Item 1; Docket Item 48-2; *see also* Docket Item 47 at 13-15 (not referring to Lanham Act claims in opposing defendants' motion to dismiss RICO claim).  But those claims cannot support the plaintiffs' RICO claim for at least two reasons.  First, this Court already has found that the plaintiffs have failed to state a claim under the Lanham Act.  *See supra* Section I.  Moreover, Lanham Act violations are not among section 1961(1)'s list of enumerated offenses and thus cannot constitute predicate acts under RICO.  *See* 18 U.S.C. § 1961(1); *Vivera Pharms., Inc. v. Blaine Lab'ys, Inc.*, 2022 WL 22893464, at *5 (C.D. Cal. Aug. 8, 2022) (holding that because "trademark infringement is not a cognizable

defendants correctly argue, *see* Docket Item 50 at 12, "[o]rdinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1)." *Spool*, 520 F.3d at 184; *MinedMap, Inc. v. Northway Mining, LLC*, 2022 WL 570082, at *1 (2d Cir. Feb. 25, 2022) (summary order) (affirming district court's dismissal of RICO claim, holding that "an ordinary theft offense such as that alleged [by the plaintiffs] does not fall within the RICO framework"). So the plaintiffs' allegations of "conversion" and the "theft . . . of . . . property"[21] do not constitute racketeering activity under RICO. *See Spool*, 520 F.3d at 184; *MinedMap*, 2022 WL 570082, at *1; *see also Mikhlin v. HSBC*, 2009 WL 485667, at *3 n.10 (E.D.N.Y. Feb. 26, 2009*)* (holding that allegations about defendants "steal[ing]" or committing "grand larceny" could not "be the basis for a pattern of racketeering activity").

In contrast, the other kinds of conduct alleged by the plaintiffs—namely, wire and mail fraud and transporting stolen property in interstate commerce—can be RICO predicate offenses. *See* 18 U.S.C. § 1961(1). The defendants say that the plaintiffs nonetheless have failed to plead racketeering activity here because their allegations of wire and mail fraud do not comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. Docket Item 28-2 at 30-31.

The Court, however, need not reach that issue. For one thing, even if the plaintiffs have not sufficiently alleged claims for mail and wire fraud, they have pleaded with some specificity that the defendants transported stolen goods in interstate

---

RICO predicate" under section 1961(1), "trademark infringement and false designation allegations are by themselves insufficient to establish [a] RICO claim").

[21] The Court discusses the plaintiffs' separate allegation that the defendants have transported stolen property in interstate commerce below.

commerce on at least three occasions, *see* Docket Item 1-23 at ¶ e.  And other than calling these claims "conclusory," the defendants do not explain why such conduct would not constitute predicate acts under section 1961(1).  *See* Docket Item 28-2 at 19-21; Docket Item 50 at 12-15.  More importantly, this Court need not determine whether the plaintiffs have sufficiently pleaded racketeering activity because it is clear that they have not pleaded the requisite pattern of such activity—the issue this Court turns to next.

### B.    Pattern

A "pattern of racketeering activity" under RICO "requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  *Spool*, 520 F.3d at 183 (quoting 18 U.S.C. § 1961(5)).  The acts in the pattern must be "related, and [either] amount to or pose a threat of continuing criminal activity."  *Id.* (quoting *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)).  This requirement, which is known as the "'continuity' requirement," can be satisfied by showing either "open-ended" or "closed-ended" continuity. *See id.*; *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989) ("'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.").  "To survive a motion to dismiss, this pattern must be adequately alleged in the complaint."[22]  *Spool*, 520 F.3d at 183.

---

[22] Notably, a civil RICO plaintiff must allege a "pattern of racketeering activity" no matter which "prong of [section] 1962" the claims are based upon.  *See Spool*, 520 F.2d at 183; *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995).  So to

The plaintiffs say that they have adequately pleaded open-ended continuity here, thus fulfilling RICO's pattern requirement. *See* Docket Item 1-23 at ¶ e(6) ("The acts detailed [in the RICO case statement], and in the [c]omplaint, form a continuous and ongoing pattern of conduct by the [d]efendants."); Docket Item 47 at 14 ("The [c]omplaint also establishes the open-ended continuity requirement and alleges that the wrongful conduct is ongoing and continuing."); Docket Item 53 at 10-11 (similar). This Court disagrees. In fact, the plaintiffs have not pleaded facts sufficient to establish either sort of continuity.

### 1.    Open-Ended Continuity

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 185 (quoting *Cofacrèdit,* 187 F.3d at 243). "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful." *Id.* (citing *Cofacrèdit*, 187 F.3d at 242-43); *see United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) ("[W]here the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity."). But the Second Circuit has held that a scheme cannot have open-ended continuity if it is "inherently terminable"—such as when there is a limited amount of stock for the alleged racketeers' use. *Cofacrèdit,* 187

---

plead either a civil RICO claim under section 1962(c) or a civil RICO conspiracy claim under section 1962(d) here, the plaintiffs must satisfy the continuity requirement.

F.3d at 244 ("[A]n inherently terminable scheme does not imply a threat of continued racketeering activity." (citation and internal quotation marks omitted)); *see GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) ("It defies logic to suggest that a threat of continued looting activity exists when, as [the] plaintiff admits, there is nothing left to loot.").

In *Spool*, for example, the Second Circuit held that the plaintiffs had failed to allege "open-ended continuity" based on allegations that the defendants "fraudulently continued to process client cases over a period of several months following the[ir] fallout" with the plaintiffs. 520 F.3d at 186. The court explained that a "scheme of th[at] sort [wa]s inherently terminable because once the defendants conclude[d] the fraudulent processing, they [would] have no more [plaintiff]-related files with which to work." *Id.* (citation and internal quotation marks omitted). And in *MinedMap,* the court held that the plaintiff had failed to allege open-ended continuity where "the heart of the alleged scheme was that [a defendant] overstated his company's ability" to engage in certain business with the plaintiff and that "he and the other defendants [we]re misappropriating [the plaintiff's] property." 2022 WL 570082, at *2. As the court noted, the case did not involve "a fraud scheme that c[ould] continue into the future" because "it w[ould] inherently cease once [the defendants] r[a]n of out [the plaintiff's] property to sell or the funds from [the plainitff's] deposit dr[ied] up." *Id.*

So too here: The defendants' alleged scheme is inherently terminable because once they run out of the products stolen from the plaintiffs, there will be nothing more for them to sell or ship illegally. *See* Docket Item 1; Docket Item 48-2. So, as in *Spool* and

*MinedMap*, once the material from the plaintiffs runs out, the scheme necessarily will cease. *See Spool*, 520 F.3d at 186; *MinedMap*, 2022 WL 570082, at *2.

The plaintiffs seek to remedy this problem by adding an allegation in the proposed amended complaint. More specifically, they say that Mohamed Aljibouri's "hacking into [their] Ware2Go system . . . evidences an intent to continue the illegal enterprise even after the stock of physically stolen property was sold off." Docket Item 48-2 at ¶ 112. And the plaintiffs assert in both the original and proposed amended complaints that the defendants' conduct constitutes a continuing threat. *See, e.g.*, Docket Item 1 at ¶ 59 ("The [d]efendants have shown that they intend to continue their illegal selling, marketing, and otherwise retaining the [p]laintiffs' products."); Docket Item 48-2 at ¶ 75 (stating that Mohammed Aljibouri's use of fraudulent login to make an illegal shipment in January 2022 shows "[d]efendants' active scheme to continue to steal [the p]laintiffs' products under the competitor business of" Bouncyhop (citing Docket Item 48-3 at 2)).

But the defendants refer only to the defendants' *intent* to continue the scheme—they do not allege that they are able to continue it. *See* Docket Items 1 and 48-2. On the contrary, the plaintiffs say that they now have uncovered the username that Mohammed Aljibouri used to continue placing orders after his employment ended. *See* Docket Item 1 at ¶ 32; Docket Item 48-2 at ¶ 35. So the plaintiffs have put an end to the alleged pilfering, and they do not say that Mohammed Aljibouri will be able to continue to use that login—or any other—in the Ware2Go system in the future. *See* Docket Items 1 and 48-2.

38

In sum, the plaintiffs have not shown open-ended continuity because the scheme they allege is inherently terminable. And because their allegations regarding a continuing threat refer only to defendants' intent to continue the scheme—not the ability to do so—the plaintiffs' allegations are insufficient to show open-ended continuity. *See MinedMap*, 2022 WL 570082, at *2 (no open-ended continuity where allegations were "largely conclusory and d[id] not allege with the requisite particularity how the fraud scheme would continue into the future").

### 2.    Closed-Ended Continuity

"To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" *DeFalco*, 244 F.3d at 321 (quoting *H.J. Inc.*, 492 U.S. at 242). "Since the Supreme Court decided *H.J. Inc.*, [the Second Circuit] ha[s] 'never held a period of less than two years to constitute a substantial period of time.'" *Spool*, 520 F.3d at 184 (some internal quotation marks omitted) (quoting *Cofacrèdit,* 187 F.3d at 242). And although the Second Circuit has stated that it does not "view[] two years as a bright-line requirement," the court has made clear that "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity." *Id.*; *see MAVL Cap., Inc. v. Marine Transp. Logistics, Inc.*, 130 F. Supp. 3d 726, 732 (E.D.N.Y. 2015).

As noted above, the plaintiffs do not argue that their allegations show closed-ended continuity. *See* Docket Item 1-23 at ¶ e(6); Docket Item 47 at 14. That is for good reason: The discrete acts of racketeering they identify in their RICO case statement all took place in December 2021 and January 2022—a period of only two months. *See* Docket Item 1-23 at ¶ e(2). In fact, Bouncyhop itself—which the plaintiffs

describe as the RICO enterprise—was "formed in August 2021," less than six months before the plaintiffs filed this case in January 2022. Docket Item 1 at ¶¶ 40, 84; Docket Item 48-2 at ¶¶ 45, 103.

What is more, even if Aljibouri began to steal the plaintiffs' goods—or planned to do so—prior to the formation of Bouncyhop, *see, e.g.*, Docket Item 1 at ¶ 32; Docket Item 48-2 at ¶ 35, those were at worst "ordinary theft offenses [or a] conspirac[y] to commit them" that do not qualify as predicate acts under RICO. *See Spool*, 520 F.3d at 184 ("The law is clear that 'the duration of a pattern of racketeering activity is measured by the RICO predicate acts' that the defendants are alleged to have committed." (quoting *Cofacrèdit,* 187 F.3d at 243)). So such acts would not expand the relevant time frame. Indeed, in *Spool*, the Second Circuit rejected the plaintiffs' argument that the court should date the start of the "pattern" to the time when "the defendants began conspiring . . . to steal [the plaintiff's] confidential files" because, the court noted, "ordinary theft offenses and conspiracies to commit them are not . . . predicate activities" under RICO. *Id.*

Accordingly, the plaintiffs have pleaded neither open-ended continuity nor closed-ended continuity here. Thus, they have not satisfied the "pattern" requirement, and so their RICO claim is dismissed. And because the proposed amended complaint does not address the identified deficiencies, the plaintiffs' motion to amend this claim is denied.

## III.    REMAINING STATE LAW CLAIMS

Finally, in addition to the federal and state law claims that this Court already has dismissed, *see supra* Sections I and II, the plaintiffs assert a number of state law claims,

*see* Docket Item 1 at ¶¶ 99-117, 124-29, 136-151, 167-72; *see also* Docket Item 48-2 at ¶¶ 118-28, 143-49, 156-72, 189-96.

A "district court[] may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Once a district court's discretion is triggered under [section] 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity[]' in deciding whether to exercise jurisdiction."  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "The exercise of supplemental jurisdiction is within the sound discretion of the district court."  *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013) (citing *Cohill*, 484 U.S. at 349-50).  "[I]n the usual case in which all federal[ ]law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state[ ]law claims."  *Kolari*, 455 F.3d at 122 (alterations in original) (quoting *Cohill*, 484 U.S. at 350 n.7); *see also Donato v. Serv. Experts, LLC*, 2018 WL 4660375, at *2 (N.D.N.Y. Sept. 28, 2018) ("Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." (quoting *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016))).

This Court has dismissed the plaintiffs' federal claims under the Lanham Act and RICO—the only claims over which this Court had original jurisdiction.[23]  *See supra*

---

[23] The plaintiffs alleged that this Court had jurisdiction based on the federal question presented by the Lanham Act and RICO claims.  Docket Item 1 at ¶ 13; Docket Item 48-2 at ¶ 12.  A federal district court also has "original jurisdiction of all civil actions

Sections I and II.  Importantly, although this action was commenced several years ago, it is still at the motion to dismiss stage, and this Court has not yet passed on the viability of any of the plaintiffs' remaining state law claims.  So judicial economy would not be served by retaining jurisdiction over those claims.  Further, because federal and state statutes provide for the tolling of the statute of limitations in cases such as this, "the parties will not be prejudiced by the operation of a time bar here."  *Chroscielewski v. Chroscielewski*, 2024 WL 5089540, at *4 (E.D.N.Y. Dec. 12, 2024); 28 U.S.C. § 1367(d) (providing for "toll[ing]" of statute of limitations "while the claim [under the court's supplemental jurisdiction] is pending and for a period of 30 days after it is dismissed unless [s]tate law provides for a longer tolling period"); N.Y. C.P.L.R. § 205(a) (stating that "[i]f an action is timely commenced and is terminated [other than under certain circumstances] . . . , the plaintiff . . . may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination").

This Court therefore declines to exercise supplemental jurisdiction over the plaintiffs' remaining state law claims, and those claims are dismissed without prejudice.

## CONCLUSION

For the reasons stated above, the defendants' motion to dismiss is GRANTED and the plaintiffs' motion to amend the complaint is DENIED.  The plaintiffs' federal

---

where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different [s]tates"—that is, diversity jurisdiction cases.  *See* 28 U.S.C. § 1332(a).  But this Court cannot exercise diversity jurisdiction here because the complaint explicitly alleges that the plaintiffs and at least some of the defendants are citizens of New York.  *See* Docket Item 1 at ¶¶ 1-12; *see also* Docket Item 48-2 at ¶¶ 1-11.

claims under the Lanham Act and RICO, as well as their state law claims for unfair

competition, trademark infringement, and trade dress infringement, are dismissed with

prejudice, and their remaining state law claims are dismissed without prejudice.  The

Clerk of the Court shall close this case.

      SO ORDERED.

      Dated:  March 31, 2025
                Buffalo, New York


                    */s/ Lawrence J. Vilardo*
                    LAWRENCE J. VILARDO
                    UNITED STATES DISTRICT JUDGE